IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2011

## STATE OF TENNESSEE v. PAUL EDWARD CORSO, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2008-A-753      Seth W. Norman, Judge**

**No. M2010-00782-CCA-R3-CD - Filed July 19, 2011**

The Defendant, Paul Edward Corso, Jr., was convicted by a Davidson County Criminal Court jury of felony murder; second degree murder, a Class A felony; aggravated robbery, a Class B felony; and theft of property over $10,000 but less than $60,000, a Class C felony. See T.C.A. §§ 39-13-202, 39-13-210, 39-13-402, 39-14-103 (2010). The trial court merged the convictions for felony murder and second degree murder and sentenced the Defendant to life for felony murder, to eight years' incarceration for aggravated robbery, and to two years' incarceration for theft, to be served concurrently. On appeal, he contends that the evidence was insufficient to support his convictions and that the trial court erred by denying his motion for a mistrial after the State asked his wife during cross-examination how often she visited the Defendant in jail. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, and NORMA MCGEE OGLE, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Paul Edward Corso, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Renee Erb and Dina Shabayek, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to the robbery and shooting death of David Hook, Jr. At the trial, Brandi Edwards testified that she dated the victim for sixteen years and that they had a daughter together. She said that although the victim owned a painting company, he fell into debt and resorted to selling marijuana and cocaine to make money. She said he began selling

drugs four months before his death in November 2007. She said she and her daughter moved out of the victim's home three weeks before his death. She said the victim asked them to find a new place to live until he could stop selling drugs because it was "getting dangerous." She said that she stayed at the victim's home during the two days preceding his death and that she was aware of the state of his home before his death. She said she learned of the victim's death from Robert Wey, a friend. She said that the fire department and the victim's mother were at the victim's home when she arrived and that she was not allowed inside the home until later that day.

Ms. Edwards testified that the victim owned a large, heavy speaker box that contained three separate speakers within the single enclosure. She did not know how much the speaker cost but said it was expensive. She said the speaker was missing from the victim's home when she was allowed inside. She said that the victim owned two bulletproof vests, one solid black and the other black with beige lettering, and that she hung the solid black vest in his closet the night before he died. She identified an exhibit as the solid black vest owned by the victim and said the vest was missing after the victim's death. She said that the victim owned a "big AK machine gun" and two small pistols and that she saw the machine gun and one of the pistols the night before the victim died. She said the machine gun was missing from the victim's home when she was allowed inside. She said that the victim hid his drugs in his closet and in the ceiling and that she saw he had about two kilograms of cocaine the day before he was killed. She said that the victim also counted $40,000 in cash the day before he was killed and that he kept the money in the same bag as the cocaine.

Ms. Edwards testified that she met the Defendant at the beginning of 2007, that she knew him for about six months before the victim died, and that the Defendant visited the victim's home. She said the victim originally bought cocaine from the Defendant and later started selling cocaine to the Defendant. She said that when she saw the Defendant at a gas station three weeks before the victim died, he asked her where the victim was, stated: "I'm gonna get him," and lifted his shirt to expose a pistol under his belt. She said she went home immediately and told the victim what happened. She said the Defendant drove his car to her place of employment the day before the victim died and met with the victim outside. She said that the Defendant owed the victim about $1100 and that he brought the victim $150 that day. She said that the debt was a source of conflict between the victim and the Defendant and that she previously heard the victim tell the Defendant to pay the debt. She said the victim spoke with the Defendant the day the victim was killed.

Ms. Edwards identified pictures of the victim's home and car and testified that the victim's home was "ransacked." The contents of the victim's dresser had been emptied onto the floor, his mattress was flipped over, and all of the cabinets in the kitchen were open. She

said that the victim's home was in order the day before he died but that it was "torn up" when she arrived after his death.

Ms. Edwards testified that the victim was a good friend of Robert Wey, who worked for the victim's painting business, and of Mike Clark, and that he saw the two men frequently. She said the victim sold drugs with Dustin Price but was not his good friend. She said that Mr. Price drove by the victim's home the morning after he was killed and that although she yelled to Mr. Price, he did not stop. She said Mr. Wey and Mr. Clark came to the home after the victim died. She said she initially suspected the Defendant of the killing because he did not come to the victim's home after the victim died. She said that the police showed her photographs at the scene and that she identified the Defendant.

On cross-examination, Ms. Edwards agreed that she slept at the victim's home the night before his death and that the last time she saw him was the next day. She said that there was only one solid black bulletproof vest in the victim's home at the time but that he had owned a second vest months earlier. She did not know if the victim traded a bulletproof vest and a pistol to the Defendant. She agreed she was not asked to identify any vest before the trial. She agreed she previously testified that the victim was not particularly concerned or upset about the money the Defendant owed him. She said the Defendant visited the victim's home at least once a week. She said the victim's home contained two working laptop computers, one belonging to the victim and the other to his daughter, and did not know if the Defendant spoke with the victim about purchasing one of the computers. She agreed the victim owned a large, square speaker box that was about four feet tall and four feet long.

Ms. Edwards testified that the victim began selling cocaine in August 2007 but agreed that he and Mr. Clark were charged with a drug crime in 2006 involving cocaine and Lortab pills. She did not know if the victim agreed to testify against Mr. Clark. She said that Mr. Clark visited the victim's home every week and that the victim supplied Mr. Clark with drugs. She did not know if Mr. Clark owed the victim money. She said that the victim and Mr. Price sold drugs to each other but that Mr. Price did not visit the victim's home every week. She said she had not seen Mr. Clark or Mr. Price with a gun. She agreed she used marijuana and cocaine with the victim. She agreed she saw two kilograms of cocaine in the victim's home the day before his death and said the cocaine was separated into ounces. She agreed she did not mention at a preliminary hearing that she saw the Defendant at a gas station days before the victim's death, that he lifted his shirt to reveal a pistol, or that he stated he would "get" the victim, but she said she mentioned the information to Officer Clinton Vogel.

On redirect examination, Ms. Edwards testified that the victim and Mr. Clark were "pulled over" together. She agreed that Mr. Clark was not charged with a drug offense and that a no true bill was brought against the victim.

Charles Bearden testified that in 2007, he lived at and was employed by a Super 8 motel in Nashville. He said he performed maintenance work for the motel. He said that he met the Defendant at the motel and that the Defendant lived there with his wife and daughter. He did not know if the Defendant had a job. He said that he fixed the rear windshield of the Defendant's red Chrysler Lebaron convertible and that he attempted to start a white Pontiac Fiero by breaking the ignition after the Defendant said he lost the keys to the car. He said he never saw anyone drive the Fiero. He identified photographs of the Defendant's red convertible. He did not remember seeing damage to the driver's side door before the victim was killed, and he said he was "pretty sure" that he opened the driver's side door and that both doors worked before the victim was killed.

Mr. Bearden testified that before the shooting, the Defendant and John "J" Petrone came to his room between 6:00 and 8:00 p.m. and asked to borrow tools to break the ignition on the white Fiero. He said that they were unable to start the car and that he carried the tools to his room. He said that when he returned, Mr. Petrone was sitting on the stairs and appeared "panicky." He said he spoke with Mr. Petrone and returned to his room. He said the Defendant came to the room around 10:00 p.m. and asked him to repair a flat tire on the Defendant's red convertible. He said the Defendant stated that he wanted to "shoot some guy and rob him" and that he would give Mr. Bearden half of what he got if Mr. Bearden repaired the tire and accompanied the Defendant on the robbery. He said the Defendant asked him to go because Mr. Petrone refused to go. He said the Defendant stated he was attempting to get $10,000 and a kilogram of cocaine during the robbery.

Mr. Bearden testified that although he could have repaired the tire, he told the Defendant he did not have the tools to repair it because he did not want to be involved. He said the Defendant was aggravated and drove off quickly when the Defendant's wife came outside and yelled something to the Defendant. He said the Defendant left around 11:00 or 11:30 p.m. He did not see the Defendant enter the car. He said he had not seen the Defendant climb through the window or the passenger's side of the car in order to drive but admitted he only saw the Defendant drive the car once or twice. He identified two photographs of the convertible and said the tire was "shredded." He said that the tire was not shredded and had some air in it when the Defendant asked him to repair it but that the tire was shredded when he saw the convertible the next morning.

Mr. Bearden testified that he woke the next morning to the sound of the Defendant's wheel scraping on the pavement as the Defendant drove into the motel parking lot. He said

he looked out his window and saw the Defendant unload a vest, a rifle wrapped in a jacket, and speakers from the passenger side of the car. He said that he did not know what type of gun the Defendant removed from the car but that he saw six or eight inches of a gun barrel sticking out from the jacket. He said the Defendant came to his room and asked him to fix the broken speakers. He said that the speaker box was large and that the carpeting was scraped off the back corner. He said the Defendant was jumpy and stated, "I shot that motherf***** three times in the face and twice on the side of the head, and I killed that motherf*****." He said the Defendant told him he obtained $10,000 and a kilogram of cocaine during the robbery and reminded Mr. Bearden that he could have had half of the drugs and money had he accompanied the Defendant. He said that the Defendant did not show him the money, cocaine, or the gun used during the robbery and that the Defendant did not say whom he killed. He said the Defendant left the speakers in Mr. Bearden's room. He said he did not call the police because he did not take the Defendant's statement seriously.

Mr. Bearden testified that he saw the Defendant later that afternoon and that the Defendant told him the police were trying to "pin" the murder on the Defendant. He said the Defendant asked him to watch the Defendant's dog because the Defendant planned to leave for a few days. He said he agreed and went to the Defendant's room. He said the Defendant handed him a blue gym bag and asked him to hold the bag for the Defendant. He said he agreed and took the bag to his room. He said that the Defendant asked him if the top laundry room had cameras and that he informed the Defendant it did not. He said he followed the Defendant when he went toward the laundry room. He said he saw the Defendant push the washing machine away from the wall and remove a large Ziploc bag full of cocaine from a hole in the wall behind the machine. He asked the Defendant where he got the cocaine, and the Defendant told him not to worry about it. He said that the Defendant left the motel in a white pickup truck with his mother and that the Defendant's mother was frantic and panicked.

Mr. Bearden testified that the blue bag given to him by the Defendant contained a .9 millimeter pistol and bullets. He said he threw the gun in the dumpster and gave the speakers to someone living at the motel because he did not want to be involved. He said the police arrived later that night looking for the Defendant. He said that he told the police he saw the Defendant earlier in the day but that he did not provide a statement to the police until after the Defendant was arrested. He said the Defendant came to his room around 9:30 or 10:00 p.m. and said he needed the blue bag because people were trying to shoot him. He said that he did not open the door but that he told the Defendant he threw the bag in the dumpster. He said he called the police and informed them the Defendant was at the motel. He said the police came and found the gun in the dumpster. He said he previously saw the Defendant with a "Glock," but he did not know the caliber of the gun.

Mr. Bearden testified that he was fixing a sink in Mr. Petrone's room when Officer Vogel came to speak with Mr. Petrone. He said that he asked Officer Vogel if they could speak and that he told Officer Vogel what happened. He said that he informed Officer Vogel he was attempting to return to his home in Florida but that he agreed to testify at the preliminary hearing and at the trial, despite living in Florida at the time of the trial. He said his girlfriend received $200 from Officer Vogel to purchase groceries because she was unable to work due to "threats" after the shooting. He said an unknown man called them and made threats. He said he did not agree to testify in exchange for the money.

On cross-examination, Mr. Bearden agreed that he initially told the police he did not know anything about the shooting. He disagreed that he spoke with the police because they paid his girlfriend $200. He agreed he did not call the police when the Defendant asked him to join in the robbery but said he did not call the police because the Defendant's wife said she was going to call the police. He agreed he had only known the Defendant for about two weeks at the time of the shooting. He said the Defendant asked him to repair a speaker box containing three speakers. He said the box was covered in gray carpet, not wood or metal. He did not know the color of the gun the Defendant removed from his car after the shooting but said he saw six to eight inches of the gun barrel and the sights at the end of the barrel. He agreed that the Defendant gave him a blue bag containing a .9 millimeter pistol and that he threw the bag in the dumpster. He said that he told the police about the bag and that they retrieved the gun. He agreed the Defendant came to his room later that night between 9:00 and 10:30 p.m. and asked for the bag because someone was trying to kill the Defendant. He said the Defendant was scared when he came to the motel.

Mr. Bearden agreed he testified at a previous proceeding that he saw a man with a gun that night and that a white car in the parking lot was burned. He said someone came to the parking lot, rammed the white Fiero, and set it on fire. He said he saw the man with the gun after the Fiero was rammed but before it was set on fire. He said he did not see how the car was set on fire. He agreed he previously testified that he saw the man with the gun at the motel about a week later but said he was not positive it was the same man. He said the man had long hair and a ponytail. He did not see anyone shoot at the Defendant or the Defendant's car. He said that the person who made threatening phone calls told him not to speak with the police but that the Defendant made no such threat.

Mr. Bearden testified that he did not know if the driver's door of the Defendant's red convertible would open. He said he believed he entered the car using the doors on both sides when he repaired the rear windshield. He said that the police did not show him a bulletproof vest and that although he never saw a vest in the Defendant's room at the motel, he saw the Defendant remove a vest from the Defendant's car.

Mr. Bearden admitted that he abused drugs when he was younger but denied abusing drugs at the time of the shooting. He said that he had not used cocaine for about twelve years but that he occasionally smoked marijuana. He agreed the Defendant gave him marijuana in exchange for repairing the Defendant's car. He denied delivering drugs for the Defendant at the motel. He said he was not "high" around the time of the shooting. He agreed he testified at a preliminary hearing that the Defendant pulled a bag of cocaine out from behind the washing machine in the laundry room and that the amount of cocaine was similar in size to a baseball cap. He said the cocaine was in several "chunks."

On redirect examination, Mr. Bearden testified that he did not call the police after the Defendant asked for assistance with the robbery because the Defendant's wife yelled to the Defendant that she would call the police if he left the motel. He said he watched the Defendant remove the heavy speaker box from his car. He said the carpet on the back corner of the box was scraped off as a result of the Defendant dragging the box.

John Petrone testified that he knew the Defendant but did not know the victim. He said that he knew Mr. Bearden from the motel but that he did not know Mr. Clark, Mr. Wey, or Mr. Price. He said that in November 2007, he lived at the Super 8 motel with his mother. He said the Defendant lived next door with the Defendant's wife, their baby, and a dog. He did not know if the Defendant was employed. He said he and the Defendant had a friendly relationship. He said that around 8:00 or 8:30 p.m. on the night of the shooting, the Defendant asked him if he wanted to help the Defendant rob a man and that when he said no, the Defendant asked Mr. Bearden. He said the Defendant previously asked for help with the robbery about two or three weeks earlier. He said the Defendant did not state that he planned to kill the man or who the robbery victim would be. He said he did not call the police because he did not think the Defendant was serious. He said that the Defendant owned a chrome and black "Glock 40" pistol and that the Defendant normally kept the gun at the waist of his pants. He thought it was unusual that the Defendant carried a gun.

Mr. Petrone testified that before the Defendant asked him to assist in the robbery, they attempted to start the Defendant's Pontiac Fiero but failed. He said that the Defendant asked him to help change the tire on the Defendant's Chrysler Lebaron but that he refused because he did not want the Defendant to rob anyone. He said the Defendant left the motel without fixing the tire. He said he stood outside when the Defendant returned later that night, around 11:00 or 11:30 p.m. He said the wheel of the car made a loud noise as it scratched the pavement. He did not remember from which door the Defendant stepped out but said he did not recall the Defendant leaving the car in a strange manner. He said the Defendant carried what appeared to be a rifle or machine gun wrapped in a towel. He said that the Defendant walked to his room and that he never saw the Defendant again. He initially said he saw the Defendant remove speakers from the car but later said he only saw the speakers

in the car. He said he spoke with the police after the Defendant was arrested and told them what happened. He said he did not receive any threatening telephone calls after the shooting.

On cross-examination, Mr. Petrone testified that he spoke with Officer Vogel after the Defendant's arrest and agreed he told Officer Vogel the same information to which he testified at the trial. He said he had been in the Defendant's room at the motel once or twice but did not remember seeing a bulletproof vest in the room. He said he never saw the Defendant give cocaine to Mr. Bearden. He denied selling hydrocodone and Xanax to the Defendant or going to a doctor with the Defendant to obtain hydrocodone.

Mr. Petrone testified that he knew the Defendant for a month and a half at the most before the robbery. He agreed he did not know the Defendant well when the Defendant asked him to assist with the robbery two or three weeks before it occurred. He agreed that on the night of the robbery, the Defendant again asked for assistance with the robbery. He agreed that he could not see what the Defendant had wrapped in the towel when the Defendant returned and that he did not know what was under the towel. He said that the Defendant always carried a pistol at his waist and that the Defendant told him it was a Glock 40.

Robert Wey testified that he was good friends with the victim and had known him a long time and visited his home many times. He said they worked together at the victim's painting company. He said the victim owned a .38 caliber gun, a machine gun, and a bulletproof vest. He knew the victim sold cocaine around the time of his death but said selling cocaine was a "new game" to the victim. He said the victim occasionally showed his drugs and money to people at his house. He said the victim had slightly less than a kilogram of cocaine at his home on the day he died. He said the victim owned a speaker box that contained three or four large speakers.

Mr. Wey testified that on November 20, 2007, he spent the day with the victim, that the victim was sick with the flu, and that the victim drank half a bottle of Nyquil that evening. He said they went to the grocery store around 10:00 or 10:30 p.m. and then to the victim's house. He said that he left to purchase food from Taco Bell and that when he returned to the victim's home around midnight, Mr. Price and "Pat" were there with the victim. He said he stayed at the home for a few minutes and then left. He said he did not return to the victim's home until 6:00 a.m. the next morning.

Mr. Wey testified that when he arrived at the victim's home the next morning, the front door was wide open. He said the victim was lying on the floor. He said he attempted to wake the victim and then realized the victim had been shot. He said the house was "trashed." He did not remember if the speaker box was in the living room and said he only

remembered seeing the victim on the floor, scattered items in the house, and a flipped mattress. He said that he drove to the victim's mother's home and told her the victim had been shot and robbed and that she called the police. He said that he returned home and told Mr. Clark, who lived with him, what happened and that he called the victim's girlfriend to inform her. He said he returned to the victim's home and spoke with Officer Vogel. He said Ms. Edwards, Mr. Price, and Mr. Clark came to the victim's home but the Defendant did not.

On cross-examination, Mr. Wey agreed that Mr. Price and Mr. Clark sold cocaine with the victim. He did not know if Mr. Price owed the victim money or vice versa. He said he never saw Mr. Price or Mr. Clark with a gun. He said he was aware the victim was arrested for selling drugs more than a year before his death.

Gary Sowell testified that he lived across the street from the victim. He said he woke to four loud bangs at 3:00 a.m. on November 21, 2007. He said he and his wife heard metal "clanging" about twenty minutes later. He looked out a window in his dining room and saw a dark-colored car sitting next to his mailbox with the engine running. He said the passenger's side of the car faced his home. He was shown a photograph of the Defendant's car but could not say whether it was the same car he saw. He said that he saw a man flipping a heavy box end over end toward the passenger's door and that he thought the object contained metal due to the loud noise it made against the concrete. He said that he saw only one person near the car, a white male of average build, and that he watched the car drive away.

On cross-examination, Mr. Sowell testified that a streetlight lit the street fairly well. He said that the car he saw did not have a flat front tire and that it did not make a scraping noise as it drove away. He said that he did not pay attention to the color of the car and that he did not know if it was a convertible. He said he did not pay attention to the clothing worn by the man he saw. He could not identify the Defendant as the driver of the car.

On redirect examination, Mr. Sowell testified that the car was parked close to the sidewalk, which was about eight inches high. He said he would not have noticed if the front tire was flat. On recross-examination, Mr. Sowell said he would have been able to tell if the car was rolling on the rim because it sped away quickly.

Myra Sowell testified that she was married to Mr. Sowell and that they lived across the street from the victim. She said she woke when Mr. Sowell asked, "Did you hear that noise?" She said she walked to the dining room and saw a dark-colored car parked on the side of the road close to the sidewalk with the engine running. She did not know the car's color but she agreed she told the police she thought the car was red. She said she did not think the car was a convertible but she was not sure. She said she heard a loud noise and saw

a white male of average build flipping a large, heavy box. She said the man struggled to shove the box onto the front seat of the car. She said the man walked around the car and entered through the door on the opposite side. She said she heard a loud noise that sounded like a gun or a car backfiring as the car drove away.

On cross-examination, Ms. Sowell testified that she could not tell what the man wore. She agreed that the street was illuminated by a street light and that the passenger's side of the car faced her home. She said she would not know if the car's tire were destroyed because it was blocked by the sidewalk and darker on the passenger's side of the car. She said she did not see sparks coming from the car as it drove away. She said she could not identify the driver of the car.

Doctor Bruce Levy, a former forensic pathologist in the State Medical Examiner's Office in Nashville, testified that an autopsy was performed on the victim. The autopsy report reflected that the victim was shot six times in the head, with four shots striking the victim's face and two shots striking the back of his head. Four lead cores and one bullet jacket were removed from the victim. Dr. Levy said that there was no evidence indicating that the shots were fired at close range and that the barrel of the gun was at least two or three feet away when the shots were fired. He said that although the autopsy was performed by Doctor Feng Li, he was the chief medical examiner at the time and reviewed all of Dr. Li's findings and agreed with Dr. Li's conclusions. He said that the victim died from the gunshot wounds and that the death was ruled a homicide. The toxicology report reflected that cocaine was found in the victim's blood. Dr. Levy said the victim was under the influence of cocaine at the time of his death. Alcohol was not found in the victim's blood. On cross-examination, Dr. Levy testified that the bullets removed from the victim's head were deformed and that he was not qualified to determine what type of ammunition the bullet fragments were.

Metro Police Officer Johnny Lawrence testified that on November 21, 2007, he was called to the victim's home to help process the scene. He identified photographs of the scene and items recovered. He said that the police found keys, speaker wire, and a cigarette lighter on the sidewalk in front of the home and that they recovered broken automobile glass in the driveway. He said a knife was found in the grass near the sidewalk. He said the police recovered two towels inside the home that appeared to have blood on them. He said he found eight .40 caliber Smith & Wesson bullet casings and a broken tooth in the living room. He said he found one lead projectile under the victim and a bullet casing next to the victim. He said a live round of ammunition was found. He said a large television in the living room appeared to have blood on it. He said that he did not lift fingerprints from the scene but that Officer Felicia Evans did.

-10-

On cross-examination, Officer Lawrence testified that he noticed one item missing from the evidence bags he opened during direct examination. He said that the evidence recovered from the scene was sent for testing and that it was not unusual for an item to be missing after being sent for testing. He agreed that he took multiple DNA swabbings and examined each stain at the scene but that he did not dust the scene for fingerprints. He agreed that the kitchen sink appeared to contain vomit and that a swab was taken.

On redirect examination, Officer Lawrence testified that if the police obtained a weapon and found live ammunition at the scene, the live ammunition would often be test-fired to determine if the markings on the live ammunition matched markings found on other bullets recovered from the scene. He said live ammunition recovered from a scene would be missing from an evidence bag if it had been test-fired.

Metro Police Officer Tim Matthews testified that in November 2007, he was called to the victim's home to help process the scene. His duties at the scene included taking photographs, making a diagram of the scene, and searching for fingerprints. He identified a diagram and photographs of the scene. He said the police found a .40 caliber cartridge on a mattress in a bedroom. He said they also found a pair of jeans containing about $1400, a laptop computer, a computer docking station, and an empty plastic box designed to hold a .9 millimeter pistol in the bedroom. He said the police did not find a .9 millimeter pistol in the house. He said that the bedroom had been ransacked, with the closet emptied and each piece of furniture turned over or disturbed, and that it appeared someone had been searching for something. He said the police found a .38 caliber revolver on the floor of a different bedroom. He identified a photograph of the kitchen and said the cabinets were opened and the contents placed on the counter. He said that the police found a set of electronic scales in the kitchen and that people often used electronic scales to measure drugs. He identified a photograph of a bathroom and said the medicine cabinet was opened and its contents removed. He recovered fingerprints from the laptop computer and from items in the kitchen and sent them for testing. He also obtained a palm print from an open cabinet door in the kitchen and sent it for testing.

On cross-examination, Officer Matthews agreed that he and Officer Evans dusted the victim's house for fingerprints. They looked for fingerprints in the kitchen, bedrooms, door frames, and on the front door. He said he dusted the dresser drawers in a bedroom and agreed he recovered fingerprints from the laptop computer and on the mirrored closet doors in a bedroom. He did not obtain fingerprints from any other doors.

On redirect examination, Officer Matthews testified that his property sheet reflected that he also collected a Glock magazine, a .9 millimeter extended magazine, and twenty .9 millimeter cartridges from the victim's home. On recross-examination, Officer Matthews

testified that he did not check the magazines for fingerprints because they were made of textured plastic that prevented usuable prints from being developed. He agreed he obtained a useable fingerprint from the .38 caliber revolver.

Metro Police Officer Felicia Evans testified that she worked as a crime scene investigator. She said she was called to the scene of a homicide at the victim's home on November 21, 2007. She said she processed the scene for latent fingerprints. She obtained fingerprints from a ceiling fan lamp globe and a laptop computer in the ransacked bedroom and found two unfired .9 millimeter cartridges in the same room. She also obtained fingerprints from inside the driver's side window of the Defendant's red Chrysler Lebaron. She said she was able to enter the car using the driver's side and the passenger's side doors. She said that the Defendant's car had a broken window and that she collected broken glass from the front passenger floor. She also found a white tank top with a reddish brown stain in the car, and it "presumptively" tested positive for blood.

On cross-examination, Officer Evans testified that she examined the dresser drawers in the ransacked bedroom and obtained fingerprints. She did not examine any other drawers or doors in the kitchen, and she did not examine any areas not mentioned in her police report. She did not obtain fingerprints from any of the doors or doorjambs. She agreed the lamp globe was found on the floor. The State conceded that the white tank top found in the Defendant's car was not sent to the Tennessee Bureau of Investigation (TBI) for DNA testing.

Brenda Russell testified as an expert on fingerprint examinations. She worked for the police department as a latent fingerprint examiner, and she examined fingerprints submitted by Officers Evans and Matthews. She said the fingerprint found on the ceiling fan lamp globe belonged to Ms. Edwards. She said other prints also matched Ms. Edwards but did not state where they were recovered. She said the prints found on the bottom of the laptop computer, the kitchen cabinet, and the interior window of the red Chrysler Lebaron belonged to the Defendant.

On cross-examination, Ms. Russell agreed that when the officers submitted the fingerprints, they believed that the prints belonged to the Defendant. She said she compared each of the submitted fingerprints to the known fingerprints of the Defendant. She said that although there was no specific number of matching characteristics needed to determine that a latent fingerprint matched a known fingerprint, she would not determine there was a match from only two matching characteristics. She said the fingerprint found on the laptop computer had sixteen matching characteristics to the Defendant's known print. She said her report did not indicate how many matching characteristics the other prints contained because she was confident those prints belonged to the Defendant. She agreed that three of the

-12-

fingerprints submitted by Officer Matthews did not match the Defendant and that three other prints were of no value because there was no information on the latent prints. She said there was no rate of error when determining fingerprint matches because all of her work was verified. She said her work was subject to peer review by another certified latent fingerprint examiner and by her supervisor.

Metro Police Officer Charles Shaw testified that on November 22, 2007, he was dispatched to a motel located at 709 Spence Lane in Nashville after receiving reports of a disorderly person who was a suspect in a homicide investigation. He said that as he searched for the suspect, he heard a loud crash. He said he went to the area where he heard the sound and found a small caliber handgun near a dumpster. He identified an exhibit as the weapon he found. He said he did not see anyone near the dumpster. He said he also found a black nylon bag near the gun. On cross-examination, Officer Shaw testified that he found the gun and the bag behind the dumpster but that he did not see who put them there. He said that he did not see the Defendant at the motel and that he was not involved in the Defendant's arrest.

Metro Police Officer Clinton Vogel testified that in November 2007, he investigated a homicide at the victim's home. He said that he also inspected the Defendant's room at the Super 8 motel and that the Defendant's wife signed a consent form to allow the search. He said he found a blue bullet-resistant vest laying on the bed next to the Defendant's wallet.

On cross-examination, Officer Vogel agreed that he interviewed Mr. Bearden at the motel but did not recall if Mr. Bearden denied knowing the Defendant or knowing anything about the victim's death. He agreed he gave Mr. Bearden's wife $200 but said Mr. Bearden provided information about the victim's death before he gave the money. He denied providing the money to ensure Mr. Bearden's continued cooperation and said Mr. Bearden had already agreed to cooperate. He said he provided the money because Mr. Bearden indicated that he and his wife were short on money and needed to buy groceries to make it through the week. He agreed the receipt created for the expense stated that Ms. Bearden was given $200 in exchange for information in a homicide.

Officer Vogel testified that his assignment was to investigate the victim's death and that other officers investigated claims that two persons shot at the Defendant, although he did not know who was assigned to that claim. He knew the Defendant's Fiero had been burned late on November 21, 2007, but he did not investigate the fire. He said the fire department investigated the car fire. He agreed his investigation revealed that other persons were seen at the motel with guns on the same day. He had no knowledge of any bullet holes in the Defendant's truck. He agreed he arrested and interviewed the Defendant.

On redirect examination, Officer Vogel testified that Mr. Bearden informed him he saw two people attempting to dispose of guns in the motel parking lot. He said he did not remember Mr. Bearden's stating that he saw people shoot at the Defendant.

Agent Robert Daniel Royce testified as an expert in firearms and tool mark identification. He said that he was a forensic scientist with the TBI and that he worked in the Firearms and Tool Mark Identification Unit. He agreed he was asked to examine items in this case and said the evidence was first examined by the Metro Police Department Firearms Identification Laboratory. He said he had a copy of the initial examiner's report when he reexamined the evidence. He said he examined twenty-two live .9 millimeter cartridges, two .9 millimeter magazines, and a .38 caliber revolver accompanied by two live cartridges and test-fired bullets and cases used during the Metro Police Department's testing of the revolver. He said he also examined four fired .40 caliber bullets, seven fired .40 caliber bullet cases, a live .40 caliber full-metal cartridge, five .40 caliber copper-jacket fragments, and three .40 caliber lead-core fragments. He agreed he wrote a report of his findings.

Agent Royce testified that the cartridges of interest in this case were .40 caliber Smith & Wesson cartridges. He said that a .40 caliber bullet could not fit into a .9 millimeter gun but that Glock made numerous .40 caliber weapons. He was not given a .40 caliber weapon to examine. He said the five .40 caliber copper-jacket fragments and three .40 caliber lead-core fragments he received from the medical examiner's office were unrelated to the .38 revolver. He agreed he was not given a weapon that matched the .40 caliber fragments. He said all of the .40 caliber bullets and cases he received were fired through the same weapon.

On cross-examination, Agent Royce agreed that the items he examined were not forensically related to the Defendant. On redirect examination, Agent Royce testified that the only information he received relative to where the weapons in this case were recovered was an address.

Michael Clark testified that he had never been arrested for drugs or arrested with the victim. He said that he and the victim were good friends and that he knew the Defendant. He said that the day before the victim was killed, he went with the victim to Home Depot to purchase painting supplies. He said that the victim had a cold but that he did not accompany the victim to the store to purchase Nyquil. He said that he was outside during the trial and that he did not hear the testimony of other witnesses. He said there was never any time when he was supposed to testify against the victim.

On cross-examination, Mr. Clark testified that he did not remember speaking with Investigator Roger Clemons or telling the investigator he had "minor charges" in the past with the victim. He denied being in a "drug business" with the victim but admitted he bought

marijuana from the victim. He said he did not supply the victim with drugs. He said Mr. Price was a drug user and was probably in a drug business with the victim.

Mr. Clark agreed that he was at the victim's home on the night the victim died. He said he and the victim visited Home Depot and arrived at the victim's home a little before 9:00 p.m. He said that he did not enter the victim's home and that he left to take a car to a body shop where he worked. When asked if he denied going to the victim's home late that night with Mr. Price, he said he did not deny it. He said he did not own a gun and did not know if Mr. Price owned a gun. He said he did not shoot at the Defendant or burn the Defendant's car the day after the victim died.

Roger Clemons testified for the Defense that he was a licensed private investigator and that he investigated the victim's murder. He said that he interviewed Mr. Clark and that Mr. Clark told him he had some minor charges with the victim in the past but did not elaborate. On cross-examination, Mr. Clemons agreed that he was hired to find evidence favorable to the Defendant. He agreed that he had access to court records and that he found no case or record of an arrest involving Mr. Clark and the victim.

Tracey Jackson, the Defendant's wife, testified that she did not know the victim but that she knew of him. She said that she knew Mr. Clark, that Mr. Clark was friends with the Defendant and introduced her to the Defendant, and that she had met Mr. Price. She said the Defendant and Mr. Clark did drug deals together. She said Mr. Clark and the victim were friends and partners in a drug business. She could not remember if she ever saw Mr. Clark or Mr. Price with a gun. She said that in November 2007, she and the Defendant lived at the Super 8 motel with their one-year-old son. She said that the Defendant owned a bulletproof vest and that she saw the vest in their motel room about a month before the victim died. She said Mr. Bearden performed maintenance on their room.

Ms. Jackson testified that she and the Defendant owned a red Chrysler Lebaron, a white Pontiac Fiero, and a burgundy Ford Taurus. She said that the driver's side door on the Lebaron was damaged when she bought the car and that the damage prevented the door from opening. She said the Lebaron had a flat tire on the night of the victim's death. She did not remember if the Defendant left the motel in one of their cars that night or if she yelled that she would call the police if the Defendant left the motel. She said the police came to the motel when her car was set on fire. She said that she did not see who burned her car but that Mr. Bearden saw who burned it. She said that Mr. Bearden told her someone shot at the Defendant but that she did not hear Mr. Bearden tell the police the same information. She said she was at work and did not see anyone shoot at the Defendant. She agreed Officer Vogel interviewed her, but she did not remember telling Officer Vogel that she saw the Defendant on the night of the victim's death and did not see the Defendant again until noon

the next day. She said that the Defendant went to a methadone clinic the next morning and that he was already gone when she awoke. She said she did not see the Defendant with $40,000 or a machine gun.

On cross-examination, Ms. Jackson testified that she did not remember telling Officer Vogel that the Defendant left the motel around 10:00 or 11:00 p.m. on the night of the victim's death or that she did not see or hear from the Defendant until the following afternoon around 1:00 p.m. when the Defendant called her to request a ride home from a methadone clinic. She did not remember if she gave written consent to a search of her room. She identified a consent form and said it reflected that she consented to a search of her motel room at 6:45 p.m. on November 21, 2007. She agreed she signed the form but said she did not read it.

Ms. Jackson testified that she did not tell the police the Defendant always carried a gun. She identified an exhibit of a bulletproof vest and said it was the vest the Defendant had at their motel room. She agreed the police took the vest from the room. She did not remember telling the police that she never previously saw the vest or that the Defendant had guns under the bed. She said the police did not find guns under the bed. She agreed she signed a consent form allowing the police to take the Defendant's Chrysler Lebaron. When asked how often she visited the Defendant in jail, she said, "Not that much." She said she did not receive any messages telling her how to testify at the trial.

On redirect examination, Ms. Jackson testified that the Defendant did not bring a large amount of money, a large speaker cabinet, or a machine gun to their motel room. She said the Defendant sold drugs to Mr. Bearden.

Stephanie Moss testified that she lived next to the victim but that she did not know him personally. She said that she had a video surveillance system at her house and that one camera faced the victim's driveway. She said that on November 20, 2007, she heard her dogs bark around 11:30 p.m. or midnight. She said she checked her surveillance system and saw a car parked in the street in front of the victim's driveway. She said the car was green and had shiny wheels and a star emblem on the back. She said she could only see the back and passenger's side of the car. She said that although she did not see anyone in the car, the engine was running. She said she saw someone run from the victim's home wearing a white t-shirt and sagging blue jeans, run around the rear of the car, pause and look around, and run to the driver's side. She did not see anything in the person's hands. She said that she did not see the person enter the car and that although the car drove away, she did not pay attention as it left. She said that she could tell someone else was there but that she did not see the other person well. She did not know if the car was a convertible or if it had a flat tire.

-16-

On cross-examination, Ms. Moss testified that she spoke with the police the morning after the victim was killed. She said she told the police the car had an octagon emblem and may have told them she saw the car at the victim's home earlier that day. She said that she had floodlights on her house, that the car was hunter green, and that she could tell there were two persons near the car. She said she woke around 11:30 p.m. or midnight, not 3:00 a.m. She said that her dogs were barking and that she did not hear gunshots. She said she did not hear any shots or see anything at 3:00 a.m.

The Defendant testified that he was twenty-four years old and that he knew the victim for three years before the victim died. He said that although he was not close friends with the victim, they sold drugs to each other. He said he was frequently at the victim's home. He said that he and the victim traded items for drugs "all the time" and that two or three months before the victim's death, the victim gave him a bulletproof vest and a .9 millimeter gun to repay a debt he owed to the Defendant. He said that the victim also offered to give him a laptop and that he inspected the victim's laptop. He did not know if Ms. Edwards was present when the victim gave him the vest and gun. He said the vest that was previously made an exhibit was the same vest the victim gave him. He said that he gave the .9 millimeter gun to Mr. Bearden a couple of days before the victim died, not the day after the victim died.

The Defendant testified that he knew Mr. Clark and Mr. Price. He said Mr. Clark was friends with the victim, visited the victim's home frequently, and bought drugs from the victim. He said he and Mr. Clark sold drugs to each other. He said that Mr. Price frequently visited Mr. Clark's home and that he saw Mr. Price at the victim's home two or three times.

The Defendant testified that he owed the victim between $800 and $1000 when the victim died. He said the victim was angry because the Defendant turned off his cell phone when the victim repeatedly called regarding the debt. He said the victim sent him a text message stating that he would kill the Defendant. He said that he drove to the victim's home on November 20, 2007, and that Mr. Price and Mr. Clark were also parked near the home. He said he arranged for Mr. Clark to help resolve the problem between the Defendant and the victim. He said that he did not go into the home but that Mr. Clark did because Mr. Clark was better friends with the victim. He said Mr. Clark left the home after five or ten minutes and told him the victim was sleeping. He said this occurred between 10:00 p.m. and 12:30 a.m. He said Mr. Clark carried a heavy grocery bag when he left the victim's home. He said Mr. Clark slammed the door on the Defendant's car and broke the window as the car sat in the victim's driveway.

The Defendant testified that he returned to his motel room, arriving around 12:30 a.m. He said he carried a t-shirt or a sweatshirt when he got out of his car. He said he did not have

a machine gun, a speaker cabinet, $40,000, or a kilogram of cocaine when he returned to the motel. He said he did not see Mr. Bearden at that time. He said that he drove his Lebaron that evening and that although one tire was low on air, it was not flat. He said that he drove to a gas station to buy materials to repair the tire but that the tire shredded on the way home. He said that he supplied Mr. Bearden with cocaine and marijuana "all of the time" and that he gave Mr. Bearden cocaine and marijuana in exchange for Mr. Bearden's fixing the rear windshield of his car. He said Mr. Bearden asked him for drugs on the night the victim was shot. He said he did not hide cocaine in the wall of the laundry room or ask Mr. Bearden to repair speakers.

The Defendant testified that someone burned his wife's Pontiac Fiero the day after the victim was killed. He said that Mr. Clark shot at him when he drove to Mr. Clark's home and that Mr. Clark threatened to kill the Defendant and his family. He said he was the only person other than Mr. Price that knew Mr. Clark entered the victim's home the night the victim died. He said he informed Officer Vogel that Mr. Clark shot at him. He said that his white truck had bullet holes in it and that the police seized the truck. He said that he asked Mr. Bearden to return the .9 millimeter gun because he was being shot at and that Mr. Bearden told him he would put the gun in the dumpster for the Defendant. He said he walked to the dumpster and saw the gun on top of it.

The Defendant testified that he learned of the victim's death on November 21 or 22, 2007, when his mother called to inform him that he was on the news and that the police were searching for him. He said he did not turn himself into the police because he feared for his life. He said that he did not kill or rob the victim and that he did not steal anything from the victim.

On cross-examination, the Defendant testified that he learned the police were searching for him before Mr. Clark shot at him. He said he was not present when the police found the bulletproof vest and his wallet in his motel room. He agreed he owed the victim money. He agreed that Mr. Bearden placed the .9 millimeter gun in the dumpster and that he ran away after seeing the police at the motel. He said he did not turn himself in because he feared the police.

The Defendant testified that on the night the victim died, he went to the victim's home between 10:00 p.m. and 1:00 a.m. He said he did not hear any gunshots. He said he did not own a .40 caliber gun. He agreed he was previously convicted for theft. He said he paid for his attorney using his mother's and his wife's savings, not using money taken from the victim. He said his wife wanted "nothing" to do with him after the victim's death. He did not know she told the police that he never came home the night the victim died, that she was

unable to locate the Defendant, or that she had never seen the bulletproof vest the police found in their room. He agreed he considered himself to be the victim in this case.

On rebuttal, Officer Vogel testified that he interviewed Ms. Jackson. He said that after she consented to a search of her motel room, she informed him that she had never seen the bulletproof vest and that she did not know where it came from. He said she told him that the Defendant left the motel around 10:00 or 11:00 p.m. the night the victim died, that the Defendant did not return home that night, and that although she called friends to search for the Defendant, she was unable to find him. On cross-examination, Officer Vogel testified that he did not find guns under the bed in the Defendant's motel room. He said he did not find speakers, cocaine, or a machine gun at the motel.

Upon this evidence, the jury convicted the Defendant of felony murder, second degree murder, aggravated robbery, and theft of property over $10,000 but less than $60,000. The trial court merged the convictions for felony murder and second degree murder and sentenced the Defendant to life for felony murder, to eight years' incarceration for aggravated robbery, and to two years' incarceration for theft, to be served concurrently. This appeal followed.

# I

The Defendant contends that the evidence was insufficient to support his convictions. He argues that Mr. Bearden was not credible, that he could not have placed a large speaker in the passenger side of his car and then driven away because the driver's side door did not work, that his car could not have been at the victim's home because Mr. and Ms. Sowell did not see or hear a car with a flat tire rolling on the rim, that Ms. Moss saw two men in a green car near the victim's home before he died, and that the evidence established he previously owned the bulletproof vest found in his room. The State contends that the evidence was sufficient to support the convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As applicable to this case, a person commits felony murder if he kills another "in the perpetration of or attempt to perpetrate any . . . robbery . . . ." See T.C.A. § 39-13-202. Second degree murder is an unlawful, knowing killing of another. See T.C.A. § 39-13-201, -210 (2010). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," and aggravated robbery is robbery accomplished with a deadly weapon, by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon, or where the victim suffers serious bodily injury. See T.C.A. §§ 39-13-401, -402 (2010). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-106(18) (2006) (amended 2009). "[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-106(20). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id.

Taken in the light most favorable to the State, Ms. Edwards testified that she saw the Defendant at a gas station three weeks before the victim died. She said the Defendant asked her where the victim was, stated, "I'm gonna get him," and lifted his shirt to expose a pistol under his belt. Mr. Petrone testified that the Defendant always carried a pistol at his waist and that the Defendant told him it was a "Glock 40." Mr. Bearden testified that he previously saw the Defendant with a "Glock," but he did not know the caliber of the gun. Dr. Levy testified that the victim was shot in the head six times. He said that the victim died from the gunshot wounds and that the death was ruled a homicide. Agent Royce testified that he received five .40 caliber copper-jacket fragments and three .40 caliber lead-core fragments from the medical examiner's office. He said all of the .40 caliber bullets and cases he received were fired through the same weapon. Officer Lawrence testified that he found eight .40 caliber Smith & Wesson bullet casings in the victim's living room.

Ms. Edwards testified that the victim owned a large, heavy speaker box that contained three separate speakers within the single enclosure. She did not know how much the speaker cost but said it was expensive. She said the speaker was missing from the victim's home after his death. Also missing was a bulletproof vest that she hung in the victim's closet the night before he died. She identified an exhibit as the missing vest owned by the victim. She said that the victim owned a "big AK machine gun" and two small pistols and that she saw the machine gun and one of the pistols the night before the victim died. She said the machine gun was missing from the victim's home after his death. She said the victim had $40,000 and about two kilograms of cocaine the day before he was killed. Mr. Wey testified that the

victim had slightly less than a kilogram of cocaine at his home on the day he died. He said that the victim owned a machine gun, a bulletproof vest, and a large speaker box that contained three or four speakers.

Mr. Sowell testified that he lived across the street from the victim and that he woke to four loud bangs at 3:00 a.m. on November 21, 2007. He said he saw a dark-colored car sitting next to his mailbox with the engine running. He said that he saw a man flipping a heavy box end over end toward the passenger's door. He said he would not have noticed if the front tire was flat because the car was parked close to the sidewalk. Although Ms. Moss testified that she saw two men in a green car parked in front of the victim's home on the night he was killed, she said she saw the car around 11:30 p.m. or midnight, not 3:00 a.m.

Ms. Sowell testified that she saw a dark-colored car with the engine running parked on the side of the road close to the sidewalk. She agreed that she spoke with the police and that she told them she thought the car was red. She said she saw a white male of average build struggle to place a large, heavy box onto the front seat of the car. She said the man walked around the car, entered through the door on the opposite side, and left. Mr. Bearden testified that he did not remember seeing damage to the driver's side door of the Defendant's red Chrysler Lebaron convertible before the victim was killed. Officer Evans testified that she examined the Defendant's red Chrysler Lebaron and was able to enter the car using the driver's side and the passenger's side doors.

Mr. Petrone testified that around 8:00 or 8:30 p.m. on the night of the victim's death, the Defendant asked him if he wanted to help the Defendant rob a man and that when he said no, the Defendant asked Mr. Bearden for help. He said that when the Defendant returned to the motel, he saw speakers in the Defendant's car. He said the Defendant carried something wrapped in a towel that appeared to be a rifle or machine gun.

Mr. Bearden testified that on the night the victim died, the Defendant came to his room around 10:00 p.m. and stated that he wanted to "shoot some guy and rob him" and that he would give Mr. Bearden half of the proceeds if Mr. Bearden fixed his flat tire and accompanied him on the robbery. He said the Defendant stated he was attempting to get $10,000 and a kilogram of cocaine during the robbery. He said the Defendant left the motel around 11:00 or 11:30 p.m. He said he woke the next morning to the sound of the Defendant's wheel scraping on the pavement as the Defendant drove into the motel parking lot. He said he looked out his window and saw the Defendant unload a vest, a rifle wrapped in a jacket, and speakers from the passenger side of the car. He said the Defendant came to his room and asked him to fix the broken speakers. He said the Defendant was jumpy and stated, "I shot that motherf***** three times in the face and twice on the side of the head, and I killed that motherf*****." He said the Defendant told him he obtained $10,000 and

a kilogram of cocaine during the robbery. Later that day, Mr. Bearden saw the Defendant enter the laundry room, push the washing machine away from the wall, and remove a large Ziploc bag full of cocaine from a hole in the wall. He said the Defendant handed him a bag containing a .9 millimeter pistol and asked him to hold the bag. He said he disposed of the .9 millimeter gun and the bag in the dumpster behind the motel and gave the speakers to a motel resident because he did not want to be involved.

Officer Matthews testified that he found an empty plastic box designed to hold a .9 millimeter pistol in the victim's bedroom. He said the police did not find a .9 millimeter pistol in the victim's house. Officer Shaw testified that he found a small caliber gun and a nylon bag near the dumpster at the Super 8 motel.

Officer Vogel testified that he found a bullet-resistant vest in the Defendant's motel room. Although Ms. Jackson testified that the Defendant owned a bulletproof vest and that she saw the vest in their motel room about a month before the victim died, her credibility was rebutted by Officer Vogel when he testified that Ms. Jackson previously informed him that she had never seen the bulletproof vest and that she did not know where it came from. Mr. Petrone also testified that he had been in the Defendant's room but did not remember seeing a bulletproof vest in the room.

We conclude that a rational trier of fact could have found the elements of felony murder, second degree murder, aggravated robbery, and theft of property over $10,000 but less than $60,000 beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's convictions.

**II**

The Defendant contends that the trial court erred by denying his motion for a mistrial after the State asked his wife during cross-examination how often she visited the Defendant in jail. He argues that the reference to his incarceration was prejudicial, predisposed the jury to a verdict of guilt, and denied him due process. The State contends that a mistrial was not warranted and that the Defendant has not shown the trial court abused its discretion by denying his motion. We agree with the State.

A mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The appellant has the burden of establishing a manifest necessity warranting a mistrial. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The decision of whether to grant a mistrial is within the sound discretion of the trial

court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990).

Due process guarantees every criminal defendant a fair trial and the presumption of innocence, including the right to the "'physical indicia of innocence.'" Willocks v. State, 546 S.W.2d 819, 820 (Tenn. Crim. App. 1976) (quoting Kennedy v. Cardwell, 487 F.2d 101, 104 (6th Cir. 1973)). In Holbrook v. Flynn, the Supreme Court noted that

> Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."

475 U.S. 560, 567 (1986) (quoting Taylor v. Kentucky, 436 U.S. 478, 485 (1978)).

During cross-examination of Ms. Jackson, the prosecutor asked, "How often do you visit your husband in jail?" Although the Defendant moved for a mistrial, he did not request a curative instruction, and the trial court did not give one. After a hearing on the motion for a mistrial, the trial court denied the motion and stated no manifest necessity was shown warranting a mistrial. The trial court held that the question did not deprive the Defendant of the "physical indicia of innocence" because it did not indicate that the Defendant was presently incarcerated at the time of the trial. The court also held that the evidence against the Defendant outweighed "any minimal effect the jury's knowledge of his prior incarceration may have had on the outcome of the verdict."

The Defendant argues that the State's reference to his incarceration was akin to forcing him to appear at trial in shackles or in jailhouse attire, which is inherently prejudicial, has the potential to deny due process, and is prohibited absent extraordinary circumstances. See Willocks, 546 S.W.2d at 820-22. This court has held that a prosecutor's brief reference regarding a defendant's incarceration "hardly compares to a defendant's appearing in shackles before the jury." State v. Joseph Matthew Maka, W2001-00414-CCA-R3-CD, Madison County, slip op. at 5 (Tenn. Crim. App. Dec. 28, 2001), app. denied (Tenn. April 29, 2002). Furthermore, reason dictates that in a case of this magnitude, jurors "must know a person on trial is either on bail or in confinement during the course of a trial." State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987).

We disagree with the trial court's determination that the prosecutor's question did not indicate that the Defendant was presently incarcerated at the time of the trial. The prosecutor asked, "How often <u>do</u> you visit your husband in jail?" (Emphasis added). This question was not past tense and referred to Ms. Jackson's visiting the Defendant around the time of the trial. We agree with the trial court, though, that the Defendant has not established a manifest necessity warranting a mistrial. The evidence of the Defendant's guilt in this case was strong, and the record does not show that the Defendant was prejudiced by the prosecutor's brief reference to his incarceration pending trial. We conclude that the prosecutor's question was not harmful in light of the weight of the evidence against the Defendant and that the trial court did not abuse its discretion in denying a mistrial.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE